# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DIANE CARGILL** | § | **CHAPTER 13** |
| SS# XXX-XX-5894 | § | |
| **DEBTOR(S)** | § | **CASE NO. BK 15-33187-DHW13** |

| | | |
|---|---|---|
| **21ST MORTGAGE CORPORATION** | § | |
| | § | |
| **MOVANT(S)** | § | |
| **VS.** | § | |
| | § | |
| **DIANE CARGILL** | § | |
| | § | |
| **AND** | § | |
| | § | |
| **SABRINA L. MCKINNEY,** | § | |
| **CHAPTER 13 TRUSTEE** | § | |
| **RESPONDENT(S)** | § | |
| | § | |

## MOTION FOR RELIEF FROM STAY BY 21ST MORTGAGE CORPORATION AND REQUEST FOR TELEPHONIC HEARING

COMES NOW 21st Mortgage Corporation, (hereinafter "Movant"), a secured creditor in the above bankruptcy proceeding and moves this Honorable Court to set this matter for telephonic hearing and enter an Order granting relief from Section 362 of the United States Bankruptcy Code to Movant so as to permit recovery of the collateral securing its claim and as grounds for said Motion states as follows:

1.      Movant is a secured creditor in the above referenced Chapter 13 proceeding.

2.      The Debtor financed the purchase of a 1998 Homestead 16' x 80' Manufactured Home, VIN #HMST12934GA and Real Property located at 50 Comet Lane, Ramer, Alabama 36069 through Movant. Movant has a security interest in this Manufactured Home and Real Property as evidenced by the documents attached hereto as Exhibit "A" and incorporated herein by reference.

3.      Movant paid the yearly insurance premium due as required by the loan documents on November 6, 2016 in the amount of $722.00 to maintain property damage insurance coverage on the Manufactured Home.  Debtor has failed to reimburse Movant for said insurance premium.

4.      Based on the forgoing, Movant asserts that it is not adequately protected, and unless Movant is granted relief from the automatic stay so as to repossess and dispose of the collateral, Movant will suffer irreparable harm and injury.

WHEREFORE, Movant moves this Honorable Court:

A.      Set this matter for telephonic hearing and enter an Order granting to Movant relief under 11 U.S.C. Section 362(d) so as to permit Movant to pursue its state court remedies, repossess and dispose of the collateral securing its claim in accordance with its security agreement and the Uniform Commercial Code and thereafter amend its claim for the deficiency which may thereafter remain.

B.      Make an award to Movant for legal fees and costs associated with this Motion in the amount of $681.00.

C.      Movant further prays that upon final hearing of this Motion that the stay will be lifted automatically and that the fourteen (14) day waiting period of Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure be waived.

D.      Movant prays for such other and further relief to which it may be entitled.

Date: October 30, 2017

/s/ Kristofor D. Sodergren
Kristofor D. Sodergren (SODEK-0591)
Attorney for 21st Mortgage Corporation
File No. 53504.020

OF COUNSEL

ROSEN ♦ HARWOOD, P.A.
2200 Jack Warner Parkway, Suite 200
Post Office Box 2727
Tuscaloosa, Alabama 35403
Telephone:  (205) 344-5000

Case No. BK 15-33187-DHW13
Page 2

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing upon the following:

*By depositing a copy of same in a pre-addressed, stamped envelope with adequate postage prepaid thereon and properly addressed to the following:*

Diane Cargill
Debtor
50 Comet Lane
Ramer, AL 36069

David E. Cargill
Co-Mortgagor
3325 Mt. Lebanon Road
Ramer, AL 36069

*Via the Court's Electronic mailing service (CM/ECF):*

Sabrina L. McKinney (trustees_office@ch13mdal.com *via CM/ECF Noticing Services*)
Trustee
Post Office Box 173
Montgomery, AL 36101-0173

Richard D. Shinbaum (rshinbaum@smclegal.com *via CM/ECF Noticing Services*)
Attorney for Debtor
P.O. Box 201
5665 Perry St. (36104)
Montgomery, AL 36101-0201

This the 30th day of October, 2017.

*/s/ Kristofor D. Sodergren*
Kristofor D. Sodergren (SODEK-0591)
Of Counsel for 21st Mortgage Corporation

| STATE OF TENNESSEE | § | AFFIDAVIT OF |
| | § | |
| COUNTY OF KNOX | § | SANDRA BRANDON |

Before me, the undersigned authority, personally appeared Sandra Brandon, hereinafter referred to as Affiant, who being known to me and being first duly sworn, deposes and says as follows:

1. My name is Sandra Brandon and I am employed by 21st Mortgage Corporation (hereinafter "Movant"). I have personal knowledge of the facts stated herein, and I am custodian of any records attached hereto. I have a personal understanding of how the books, records and computer systems relating to loan servicing at Movant function and how they relate to the bankruptcy proceeding filed by Diane Cargill (hereinafter "Debtor"). Among my responsibilities as an employee of Movant is to monitor the processing of payments and other requirements of the Debtor under the terms of the *Retail Installment Contract, Security Agreement and Mortgage*.

2. The Debtor executed a *Retail Installment Contract and Security Agreement* (hereinafter "Contract") *and Mortgage* to Movant in the principal amount of $22,415.94 on November 8, 2007, which is secured by property being more particularly described in Movant's Motion for Relief on file and as evidenced by the Contract and in Movant's Motion for Relief from the Automatic Stay filed contemporaneously therewith. Movant is the current holder of said Contract and Mortgage. True and correct copies of the Contract, the Certificate of Title and Mortgage evidencing the perfection of Movant's security interest in the property are attached to the Motion for Relief from Stay as Exhibit "A". As of October 26, 2017, the aggregate amount due and owing Movant under the terms of the contract is $12,857.28. Debtor's Schedule D lists the current value of Debtor's interest in the property as $7,397.00. The subject note with Movant bears a rate of interest as provided therein.

3. Movant paid the yearly insurance premium due in the amount of $722.00 on November 6, 2016. The Debtor has failed to reimburse Movant for said insurance premium.

4. The information contained herein and in the attached Exhibits is based upon business records that Movant keeps in the ordinary course of its business, made at or near the time of the facts stated thereby, which Movant keeps, maintains and generates as part of its ordinary course of business. All of the above statements are true and correct and stated as facts based upon my own personal knowledge.

*Sandra Brandon*
AFFIANT
21st Mortgage Corporation

SWORN TO and SUBSCRIBED before me on this the 30th day of October, 2017.

*Autumn J. Anderson*
Notary Public
My Commission Expires: 12-26-2017

# INSTALLMENT CONTRACT—SECURITY AGREEMENT

CREDITOR: 21st Mortgage Corp.    Reference Number:

| | |
|---|---|
| Borrower Name: DIANE C CARGILL | Co-Signer Name: |
| Borrower Name: | Co-Signer Name: |
| Address: 50 COMET LN | Borrower's Social Security Number: |
| City: RAMER    County: | Tel. No.: |
| State: AL    Zip Code: 36069 | |

Proposed location of manufactured home: 50 COMET LN. RAMER, AL 36069

"I", "me", and "us" refer to all persons who sign this Installment Contract and Security Agreement ("contract") as borrower or co-signer, jointly and severally. "You" and "your" refer to the creditor.

**Security Interest:** I give you a security interest under the applicable certificate of title law and the applicable Uniform Commercial Code in the Manufactured Home and any property added or attached to it, to secure my obligation under this Contract. I also assign directly to you any interest I may have in premium refunds or proceeds under any insurance covering the Manufactured Home. I agree to execute any application for certificate of title or ownership, financing statement or other document necessary to perfect your security interest in the Manufactured Home. I authorize you to prepare and file financing statements signed only by you. If real estate secures payment and performance of my obligations under this contract, I have signed a mortgage or deed of trust.

## DESCRIPTION OF MANUFACTURED HOME    ☐ New    ☑ Used

| TRADE NAME: HOMESTEAD | ADDITIONAL ACCESSORIES AND FURNISHINGS: | | | |
|---|---|---|---|---|
| | ITEM | SERIAL# | ITEM | SERIAL# |
| YEAR: 1998   MODEL: SOUTHERN CHARM | | | | |
| LENGTH: 80    WIDTH: 16 | | | | |
| SERIAL NO: HMST12934GA | | | | |
| SERIAL NO: | | | | |

## ITEMIZATION OF AMOUNT FINANCED:   INSURANCE:

| | | | |
|---|---|---|---|
| 1. | Cash Price or Refinance Amount | $24,497.50 | |
| | (Including Sales Tax of $597.50    ) | | |
| | Cash Down Payment | $4,348.63 | |
| | Rebate to Buyer | $0.00 | |
| | Trade-In (Year, Make, Model) | | |
| | | | |
| | Length    Width | | |
| | Gross Value    0 Liens    0 | | |
| | Net Trade-In Value | $0.00 | |
| 2. | Total Down Payment | $4,348.63 | |
| 3. | Unpaid Balance of Cash Price or Net Amount Paid to Others on My Behalf (1 minus 2) | $20,148.87 | |
| 4. | Amounts paid to others on my behalf** | | |
| | a. To Insurance Companies | $543.00 | |
| | (1) Property Insurance | $0.00 | |
| | (2) Credit Life Insurance | $0.00 | |
| | b. To Public Officials | $15.00 | |
| | (1) Certificate of Title | $0.00 | |
| | (2) Filing Fees | $0.00 | |
| | c. To: Loan Origination Fee | $647.07 | |
| | d. To: Doc Prep Fee | $200.00 | |
| | e. To: Attorney Fee | $862.00 | |
| | f. To: | $0.00 | |
| | g. To: | $0.00 | |
| | h. To: | $0.00 | |
| | i. To: | $0.00 | |
| | j. To: | $0.00 | |
| | Total (items a through j.) | $2,267.07 | |
| 5. | Unpaid Balance (3 plus 4) | $22,415.94 | |
| 6. | Prepaid Finance Charge | $847.07 | |
| 7. | Amount Financed (5 minus 6) | $21,568.87 | |

**I understand and agree that a portion of certain of these amounts may be retained by you or your affiliate.

**INSURANCE:**

PROPERTY INSURANCE ON THE MANUFACTURED HOME IS REQUIRED FOR THE TERM OF THIS CONTRACT. I HAVE THE RIGHT TO OBTAIN SUCH INSURANCE FROM ANYONE AUTHORIZED BY LAW TO SELL IT. However, by checking the appropriate box below, I elect to buy through you property insurance of the specified term and premium.

| Type of Insurance | Term | Premium |
|---|---|---|
| ☑ Property Insurance | 12 months | $543.00 |

CREDIT LIFE INSURANCE IS NOT REQUIRED TO OBTAIN CREDIT, AND I DO NOT HAVE TO PURCHASE CREDIT LIFE INSURANCE THROUGH YOU UNLESS I SIGN AND AGREE TO PAY THE ADDITIONAL COST.

| Type of Coverage | Term | Premium |
|---|---|---|
| ☐ Individual Credit Life | 0 | |
| ☐ Joint Credit Life | | |

This credit life insurance may not pay off all my debt and the exact amount of coverage is shown on my policy or certificate. If I elect credit insurance, the name(s) of the proposed insured(s) are:

Proposed Insured:    Age:
Proposed Insured:    Age:
(Only co-borrower can be insured jointly.)

My signature below and the checked coverage(s) above indicate my election to obtain credit life insurance coverage and/or property insurance for the term and premium shown.

Signature _Diane C Cargill_    Date _11/8/07_
Signature _____    Date _____
(If joint coverage desired, both proposed insureds must sign.)

Borrower Initials _D.C_    Borrower Initials _____    Page 1 of 4    Co-Signer Initials _____    Co-Signer Initials _____

rptALDirect1

EXHIBIT
A

**Promise to Pay:** I promise to pay you the Unpaid Balance shown with interest at the rate of 11.25 % per year until the debt is fully paid. I will pay this amount in 170 installments as shown in the payment schedule below. Each monthly payment will be applied as of its scheduled due date. If no interest rate is disclosed above, the interest rate is the Annual Percentage Rate shown below.

| ANNUAL PERCENTAGE RATE The cost of my credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost me. | Amount Financed The amount of credit provided to me or on my behalf. | Total of Payments The amount I will have paid after I have made all payments as scheduled. |
|---|---|---|---|
| 11.99 % | $23,350.23 | $21,568.87 | $44,919.10 |

**MY PAYMENT SCHEDULE WILL BE:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 170 | $264.23 | Monthly, beginning 12/15/2007 |

**Security:** I give you a security interest in:
- ☑ the manufactured home; accessions; and proceeds.
- ☑ real property located at: 50 COMET LN. RAMER, AL 36069

**Late Charge:** If a payment is more than 15 days late, I will be charged $5.00 or 5% of the installment past due, whichever is less.

**Prepayment:** If I pay off early, I will not have to pay a penalty, but I will not be entitled to a refund of the prepaid finance charge, if any.

**Assumption:** Someone buying my manufactured home may, under certain circumstances, be allowed to assume the remainder of the contract on the original terms.

**Insufficient Funds Payments:** If permitted by law, I agree to pay you the lesser of $20.00 or the maximum amount allowed for each loan payment check or draft which is returned to you unpaid.

See contract terms for additional information about nonpayment default, required repayment in full before the schedule date and prepayment refunds and penalties.

## ADDITIONAL TERMS AND CONDITIONS

**PROPERTY INSURANCE:** I agree to insure the Manufactured Home against physical damage for the term of the contract at my expense. The minimum coverage will be Broad Form Comprehensive, including flood coverage, in an amount equal to the lesser of the amount financed or the value of the Manufactured Home. The insurance policy will contain a loss payable clause protecting you (as your interest may appear), and provide for 10 day notice of cancellation to you. I have the right to choose the person through whom the property insurance is obtained. If my insurance coverage expires or is canceled prior to payment in full of this contract, I must obtain no less than the minimum coverage at my expense for the remaining term of the contract. Should I fail to maintain the minimum coverage, you may, but are not obligated to, obtain the minimum coverage. The minimum coverage may be purchased to insure your interest only. In such event, you will be acting solely on your own behalf; and, neither you nor any insurance agent will be acting on my behalf. I acknowledge that single-interest insurance does not provide coverage for my interest in the collateral. Single-interest insurance may be more expensive than a policy purchased by the owner of the collateral. It will not fulfill the obligation to maintain liability insurance imposed upon Borrower(s) under the financial responsibility law of any state. **I UNDERSTAND THAT ANY INSURANCE PROVIDED BY YOU UNDER THIS CONTRACT WILL NOT PROVIDE COVERAGE FOR BODILY INJURY AND/OR PROPERTY DAMAGE CAUSED TO OTHERS. CREDIT INSURANCE:** I acknowledge that the creditor has a financial interest in the sale of insurance, and may benefit from the sale of such insurance by virtue of commission income which it may receive. If I purchase it, credit life insurance proceeds will be used to repay my debt to you in the event of my death, as described in the insurance certificate. If I purchase insurance through the creditor, the insurance premium is included in the amount financed under this note. Individual term life insurance may be available to me at a lower cost than credit life insurance. In the case of death, the credit life insurance may not pay the entire unpaid balance of the debt owed to you. This is true if any payments are past due at the time that the insured dies. I have read the insurance certificate for details on the amount of coverage. A co-borrower may cancel his or her insurance, and the creditor has no obligation to notify the other co-borrower(s). In the event of a covered claim, any insurance proceeds in excess of the unpaid loan balance will be paid to the second beneficiary shown on my certificate, or if none is shown, then to my estate.

Borrower Initials _____   Borrower Initials _____   Co-Signer Initials _____   Co-Signer Initials _____

Page 2 of 4

**PREPAYMENT:** I MAY PREPAY THIS CONTRACT IN FULL OR IN PART AT ANY TIME WITHOUT PENALTY, BUT I WILL NOT BE ENTITLED TO A REFUND OF THE PREPAID FINANCE CHARGE, IF ANY.

**DELINQUENCY AND DEFAULT:** Time is of the essence. If a payment is more than 15 days late, I agree to pay $5.00 or 5% of the installment past due, whichever is less. If I fail to make payment when due or otherwise fail to perform any of my obligations under this contract, I am in default. In the event of my default, you will give me notice of the right to cure the default where required by law. I am not, however, entitled to notice of default more than twice in any one-year period. Under no circumstances am I entitled to a notice of right to cure the default where I have either abandoned or voluntarily surrendered the Manufactured Home. If I have not cured the default within 30 days after the postmark date of the notice, you may accelerate the maturity of the debt and require me to pay you the entire remaining balance of the Contract. You may take legal action against me, and you may foreclose on or repossess the Manufactured Home and any other things covered by the security interest I have granted. In the event of default, I also agree to pay your expenses for (a) reasonable attorney's fees, not to exceed 15% of my unpaid debt, after referral to an attorney who is not your salaried employee; (b) court costs and disbursements; and (c) costs of peacefully repossessing or foreclosing on the Manufactured Home and any other things covered by the security interest, and such costs may include the costs of storing, reconditioning, and reselling it, subject to the pertinent provisions of the **Uniform Commercial Code.**

**PERSONAL PROPERTY:** I agree that regardless of how my Manufactured Home is attached to the real property, my Manufactured Home is and shall remain personal property and shall not become a fixture or part of the real property.

**PERSONAL PROPERTY TAXES:** I agree to pay any and all personal property taxes assessed against my Manufactured Home and agree that failure to pay such taxes shall constitute a default under this contract.

**CREDIT INFORMATION:** You may investigate my credit history and credit capacity in connection with opening and collecting my account and share information about me and my account with credit reporting agencies. You may furnish information about me, including insurance information, to all others who may lawfully receive such information. You may furnish specific information about the Manufactured Home and any insurance policies on the Manufactured Home to any affiliated insurance agent or agent that I direct to enable such agent to quote premiums to me and solicit my insurance business. (Please see Seller's and Assignee's privacy policies for more information.

**OTHER TERMS AND CONDITIONS:** I agree: (a) not to remove the Manufactured Home from the address shown on this contract unless I notify you in advance and receive your written consent; (b) not to sell the Manufactured Home without first obtaining your written consent; (c) that if the Manufactured Home is a personal property I will not let it become part of any real estate; (d) not to encumber or abandon the Manufactured Home or use it for hire or illegally; (e) to pay promptly all taxes and any liens and encumbrances of the Manufactured Home; and (f) to pay with my monthly installments, if requested to do so by you, the estimated amount necessary to pay yearly taxes, assessments and insurance premiums that will become due within the next twelve month period.

**ASSIGNMENT:** You may assign this contract to any person or entity. All rights granted to you under this contract shall apply to any assignee of this contract.

**WAIVER AND MODIFICATION:** Your waiver of any default shall not constitute a waiver of any other default. The procurement of required property insurance, or the payment of taxes, or other liens, or other charges, by you shall not be a waiver of your right to accelerate the maturity of this contract and declare a default herein. Your allowance of a reinstatement upon default will not be a waiver of the right to declare future accelerations and any forbearance shall not be a waiver of other current or future rights of noteholder nor shall preclude the exercise of any such rights or remedies.

**ENTIRE AGREEMENT:** This contract, any separate written alternative dispute resolution agreement, any mortgage or deed of trust that the borrower signs as part of this contract and any separate written warranty constitute the entire agreement between us. I agree that no representations, oral or written, have been made to me to induce me to enter into this contract, other than the representations expressly set forth in this contract, any separate written alternative dispute resolution agreement, and in any separate written warranty.

**WARRANTIES:** Any warranties relating to a new Manufactured Home have been provided to me by my dealer, or warranty company, or the manufacturer in a separate writing, receipt of which I hereby acknowledge. Except as provided in such a writing, if any, there are no warranties, express or implied, including but not limited to warranties of merchantability or fitness for a particular purpose. I acknowledge that I have examined the Manufactured Home and that, if it is used, I accept the Manufactured Home "as is." The year of the Manufactured Home as specified in this contract is for identification purposes only. No assignee of this agreement shall be liable, either in tort or contract, for any direct or indirect damages or for any special, incidental, or consequential damages arising out of or in connection with this contract or transaction.

**VALIDITY:** Wherever possible each provision of this contract shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this contract shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this contract. This contract shall be of no effect until and unless signed by me and you.

Borrower Initials X C    Borrower Initials_____        Co-Signer Initials_____        Co-Signer Initials_____

**CO-SIGNER OBLIGATION:** I guaranty that all amounts owed under this contract will be paid when due. I will still be obligated even if the borrower(s) are released or if you waive or delay enforcement of any of your rights under this contract. You do not have to give me notice of any such waiver, delay or release. I also have to pay your attorney's fee and other costs of enforcing this co-signer obligation.

To contact 21st Mortgage Corp. about this account Call (800) 955-0021. This contract is subject to Alabama and Federal law which is enforced by the State Banking Department, 401 Adams Avenue, Montgomery, Alabama 36130. Telephone (334) 242-3452. Contact the Superintendent of Banks relative to any inquiries or complaints.

<u>ACCEPTED: BORROWER ACKNOWLEDGES THAT A SEPARATE ALTERNATIVE DISPUTE RESOLUTION AGREEMENT (ARBITRATION AGREEMENT) IS PART OF THIS CONTRACT.</u>

**NOTICE TO THE BORROWER:** DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF THE CONTRACT CONTAINS BLANK SPACES. YOU ARE ENTITLED TO A COPY OF THE CONTRACT YOU SIGN.

**ACKNOWLEDGMENT:** I AGREE TO ALL THE TERMS ON ALL THE PAGES OF THIS CONTRACT AND ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS CONTRACT.

**CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

Borrower _Diane C Cargil_____    Date: _11/8/07___
     Diane C. Cargill

Borrower_____

Not Valid unless accepted by Creditor: by _Shelby McCall_____ (21st Mortgage Corporation)

Co-Signer_____    Address_____

Co-Signer_____    Address_____

_____

21st Mortgage Corporation assigns to_____
the foregoing contract including all amounts payable by borrower and the security interest in the collateral, without recourse.

Date: _____   By: _____   Title: _____

Rev. 04/98 – Alabama Land Home / Refinance – TW:pb:jl      Page 4 of 4

STATE OF
**ALABAMA**
DEPARTMENT OF REVENUE

## CERTIFICATE OF TITLE FOR A VEHICLE

| TITLE NO. | VEHICLE IDENTIFICATION NUMBER | TRANS CODE | DATE ISSUED |
|---|---|---|---|
| 38158914 | HMST12934GA | 03 | 12/07/2007 |

| YEAR MODEL | MAKE | MODEL | BODY TYPE | PREV AL TITLE NO. |
|---|---|---|---|---|
| 1998 | HOME | SO CHARM | MH | 37969473 |

| | | | PURCHASE DATE | NO. LIENS | COLOR | ODOMETER |
|---|---|---|---|---|---|---|
| OO | XX | | 11/08/2007 | 1 | CRM | EXEMPT |

OWNER AND/OR LESSOR'S NAME & ADDRESS
CARGILL DIANE C
50 COMET LANE
RAMER AL 36069

1,071 / 658
21ST MORTGAGE CORPORATION
PO BOX 477
KNOXVILLE TN 37901-0477

MAIL TO IF ADDRESS DIFFERENT

LEGEND(S)

1ST LIENHOLDER'S NAME, ADDRESS AND LIEN DATE    11/08/2007

21ST MORTGAGE CORPORATION
PO BOX 477
KNOXVILLE TN 37901

2ND LIENHOLDER'S NAME, ADDRESS AND LIEN DATE

RELEASE OF LIEN
The holder of lien on the vehicle described in this Certificate does hereby state that the lien described in said Certificate of Title is satisfied and discharged.

_____
First Lienholder

By _____
Signature of Authorized Agent

Date _____

_____
Second Lienholder

By _____
Signature of Authorized Agent

Date _____

CONTROL NUMBER
35176327

KEEP IN A SAFE PLACE    ERASURE VOIDS THIS TITLE

After Recording Return To:

**SELLERS & VICK, L.L.C.**
Attorneys at Law
603 South Hull Street
Montgomery, Alabama 36104-5808

CERTIFIED TO BE A TRUE &
EXACT COPY OF ORIGINAL

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated _____, _____, together with all Riders to this document.

(B) "Borrower" is DIANE C. AND DAVID E. CARGILL, A MARRIED COUPLE. Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is 21ST MORTGAGE CORPORATION. Lender is a CORPORATION organized and existing under the laws of DELAWARE. Lender's address is 620 MARKET ST., ONE CENTRE SQUARE, KNOXVILLE, TN 37902. Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated _____, _____. The Note states that Borrower owes Lender TWENTY TWO THOUSAND FOUR HUNDRED FIFTEEN DOLLARS AND 94/100 (U.S. $22,415.94) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 15TH, 2022.

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider  ☐ Other(s) [specify]_____
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001  1/01   *(Page 1 of 15 pages)*

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to Lender, with power of sale, the following described property located in the COUNTY of MONTGOMERY:
[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE ATTACHED EXHIBIT "A" AND INCLUDING A 1998 HOMESTEAD MANUFACTURED HOME, SOUTHERN CHARM MODEL, 80X16, WITH A SERIAL NUMBER OF HMST12934GA.

which currently has the address of    50 COMET LN.
                                        [Street]

RAMER, Alabama              36069    ("Property Address"):
   [City]                            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001 1/01    *(Page 3 of 15 pages)*

return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001  1/01     *(Page 4 of 15 pages)*

under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the

date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3001  1/01   *(Page 6 of 15 pages)*

satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001  1/01   *(Page 7 of 15 pages)*

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not

ALABAMA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3001  1/01     (Page 8 of 15 pages)

be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3001 1/01 *(Page 9 of 15 pages)*

promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument

ALABAMA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001 1/01      *(Page 10 of 15 pages)*

granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall

constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to

any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products,

toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3001 1/01    *(Page 14 of 15 pages)*

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in BALDWIN County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _Diane C Cargill_____ (Seal)
                              DIANE C. CARGILL         - Borrower

_____     _David E Cargill_____ (Seal)
                              DAVID E. CARGILL         - Borrower

_____ [Space Below This Line For Acknowledgment] _____

STATE OF __ALABAMA____
COUNTY OF __MONTGOMERY__
Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared DIANE C. AND DAVID E. CARGILL, A MARRIED COUPLE, known to me to the person whose name subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of the Office this the 8th day of __November__, 2007

My commission expires November 21, 2009          _Chenoa B Vick_
                                                 Chenoa B. Vick

ALABAMA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001 1/01     (Page 13 of 14 pages)

## Exhibit A

Commence at the intersection of the West line of the SE ¼ of the SE ¼ of Section 1, T 12E, R 18E, with the intersection of the North R.O.W. of the Lower Dublin Road; thence, S 53° 41' E along said North R.O.W. for a distance of 446.64 feet to the point of beginning; thence, S 53° 41' E along said R.O.W. for a distance of 46.69 feet; thence , N 51° 22' E, 390.93 feet; thence, N 34° 25' W, 167.54 feet; thence, S 34° 59' W, 432.90 feet to the point of beginning. The above described parcel of land lies in the SE 1/4 of the SE 1/4 of Section 1 and the NE ¼ of the NE ¼ of Section 12, both in T 12N, R 18E, Montgomery County Alabama.